**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jean-Marie T. and Stephen T., individually and on behalf of P.T., | : : : | |
| Plaintiffs, | : : | Civil Action No. |
| v. | : : | |
| Council Rock School District, | : : | |
| Defendant. | : | |

**COMPLAINT**

**PRELIMINARY STATEMENT**

1. This action is brought under the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), and Title II of the Americans with Disabilities Act (ADA).

2. Plaintiffs Jean-Marie T. and Stephen T. (Parents) bring this action individually and on behalf of their child, P.T., who is a student with disabilities in Council Rock School District.

3. Parents filed a special-education due process complaint against the District on January 13, 2025, and they amended their complaint on June 9, 2025.

4. Parents filed the complaint because the District failed to provide P.T. with a free and appropriate public education (FAPE) and denied her equal access to the District's programming.

5. Because the District denied P.T. the special-education services she needs, P.T. did not make educational progress.

6. Rather than sit idly by while P.T. languished, Parents spent hours each night helping

1

P.T. with her schoolwork, and they paid for special-education instructional services that the District should have provided her—intensive reading instruction and math tutoring.

7.      But even with Parents' efforts, P.T. still struggled. Although she is a child with average to above-average intelligence, she consistently scored in the "well below" range on the District's benchmark assessments for literacy and math.

8.      In their due process complaint, Parents sought compensatory education, reimbursement for independent educational evaluations, reimbursement for private tutoring, and reimbursement for P.T.'s placement at a private school for students with disabilities.

9.      On January 11, 2026, a hearing officer issued a decision finding, in part, against Parents. *See* H.O. Dec., attached as Ex. A.

10.     Parents bring this action to challenge the hearing officer's decision and vindicate P.T.'s rights under the IDEA, Section 504, and the ADA.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and under the IDEA, Section 504, and the ADA.

12.     Venue is proper under 28 U.S.C. § 1391(b).

13.     Parents have fully exhausted their administrative remedies.

## PARTIES

14.     Parents Jean-Marie T. and Stephen T. are the plaintiffs and P.T.'s parents.

15.     P.T. is a student with Attention Deficit Hyperactivity Disorder (ADHD).

16.     P.T. also has dyslexia.

17.     By reason of her ADHD, she requires special-education services.

18.     By reason of her dyslexia, she requires special-education services.

2

19.    P.T. is "disabled" under Section 504 and the ADA.

20.    P.T. is otherwise qualified to participate in school activities under Section 504 and the ADA.

21.    The District is a local educational agency (LEA) under the IDEA, and at all relevant times to this complaint, the District was P.T.'s LEA.

22.    The District receives federal funding.

## STATUTORY AND REGULATORY BACKGROUND

23.    Congress enacted the IDEA to "ensur[e] children with disabilities and the families of such children [have] access to a free appropriate public education and [to] improv[e] educational results for children with disabilities." 20 U.S.C. § 1400(c)(3).

24.    The IDEA and its implementing regulations, 34 C.F.R. Part 300, *et seq.*, require states and LEAs that receive IDEA funds to provide children with disabilities a free appropriate public education (FAPE).

25.    A child is eligible for services under the IDEA if she has a disability and "by reason thereof, needs special education and related services." 34 C.F.R. § 300.8(a).

26.    Section 504 likewise requires children with disabilities to receive FAPE, but it protects more children, affording protection to any child who has an impairment that substantially limits a major life activity but who is otherwise qualified to participate in school activities.

27.    Section 504 prohibits the exclusion of, or discrimination against, any otherwise qualified individual with a disability by recipients of federal funds. Failure to provide necessary accommodations and supplemental services is discrimination under Section 504.

28.    The ADA extends the nondiscrimination rule of Section 504 to services provided by any "public entity" without regard to whether the entity is a recipient of federal funds.

29.    The IDEA, Section 504, and the ADA require LEAs to appropriately evaluate children with disabilities.

30.    When a parent establishes that an LEA failed to appropriately evaluate her child, the parent is entitled to an independent educational evaluation (IEE) at public expense. 34 C.F.R. § 300.502(b). The LEA must consider the IEE when programming for the student. *Id.* § 300.502(c)(1).

31.    The IDEA also requires states and LEAs to develop an Individualized Education Program (IEP) for qualifying children with disabilities. 20 U.S.C. § 1412(a)(4).

32.    Each IEP must contain a statement of the student's present levels of academic achievement, measurable annual goals, a description of how the student's progress towards those goals will be measured, and a list of accommodations, supplementary aids and services, and modifications needed to help the student achieve her goals and be educated in the least restrictive environment. 20 U.S.C. § 1414(d)(1)(A)(i).

33.    The LEA's IEP team is supposed to review and offer a new IEP annually. 20 U.S.C. § 1414(d)(4)(A).

34.    IEPs must provide services and supports that are reasonably calculated to afford children FAPE. *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 390–91 (2017). The IEP is the centerpiece for the child's education. *Id*.

35.    Under Section 504 and the ADA, children with disabilities must receive service plans that provide them FAPE. "Schools are required to provide education and services that 'are designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met.'" *A.C. v. Owen J. Roberts Sch. Dist.*, 554 F. Supp. 3d 620, 623 (E.D. Pa. 2021) (quoting 34 C.F.R. § 104.33). That means, under Section 504 and the ADA,

schools "must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as nonhandicapped persons. 34 C.F.R. § 104.33(b)(2).

36.     If an LEA fails to properly identify, evaluate, place, or provide FAPE to a child, her parents may request a due process hearing.

37.     If the child's parents establish a denial of FAPE or discrimination under the IDEA, Section 504, or the ADA, they may be entitled to various remedies, including tuition reimbursement. *See Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 12–16 (1993); *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985); *Molly L. v. Lower Merion Sch. Dist.*, 194 F. Supp. 2d 422, 429 (E.D. Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA.").

38.     Parents are entitled to tuition reimbursement if: (1) the public school did not provide a FAPE; (2) placement in a private school was proper; and (3) the equities weigh in favor of reimbursement.

39.     Other remedies available to parents are compensatory education, reimbursement for private tutoring, and reimbursement for Independent Educational Evaluations.

40.     Compensatory education is an equitable award, which can be used for tutoring, counseling, social-skills training, educational summer programs, and other services that remedy a FAPE denial.

41.     If parents are aggrieved by a hearing officer's decision, they can challenge the decision in this Court. 20 U.S.C. § 1415(i)(2).

42.     Prevailing parents may recoup their statutory attorney's fees and costs under the IDEA, Section 504, and the ADA.

5

**STATEMENT OF FACTS**

43.    P.T. is a child with academic potential.

44.    She has average- to above-average intelligence.

45.    She also has a strong work ethic.

46.    P.T.'s IQ scores range from 102 to 116.

47.    P.T. was diagnosed with ADHD during the 2020-2021 school year, when she was in second grade.

48.    Her ADHD causes her to struggle with attention, organization, and focus.

49.    P.T.'s pediatrician who diagnosed her with ADHD also suspected that she has dyslexia.

50.    The pediatrician recommended that Parents ask the District to evaluate P.T. to determine whether she is eligible for an IEP under the IDEA.

51.    Around the same time, P.T.'s second-grade teacher requested that P.T. receive instructional assistance.

52.    The second-grade teacher expressed concern about P.T.'s reading, writing, math, auditory processing, and behavior.

53.    Parents requested an evaluation under the IDEA in spring 2021.

54.    Despite P.T.'s diagnosis, and the second-grade teacher's concerns, the District denied Parents' request for an evaluation under the IDEA.

55.    Instead, the District provided P.T. a Section 504 service plan.

56.    At the start of fourth grade, the 2022-2023 school year, Parents emailed P.T.'s teacher because she was struggling with her homework: "Just wanted to reach out about [P.T.] yesterday with homework. She got extremely frustrated and upset with herself. We had some tears

and then she said she is the slowest one in class and not able to finish her work and started crying again." P-53 at 16.[1]

57.    P.T.'s difficulties with homework continued throughout fourth grade.

58.    Parents repeatedly informed the District about the difficulties.

59.    P.T. scored below basic in fourth grade in all of the English Language Arts portions of the Pennsylvania System of School Assessment (PSSA). P-10 at 17.

60.    Because P.T. continued to struggle, Parents hired a private tutor for her in fourth grade.

61.    The private tutor was a special-education teacher who worked at P.T.'s school.

62.    In fourth grade, Parents again requested an evaluation under the IDEA.

63.    This time, the District evaluated P.T., issuing an evaluation report on January 26, 2023.

64.    The report recognized that P.T. has reading deficits.

65.    The report found an 18-point difference between P.T.'s full scale IQ and her basic reading composite score.

66.    Typically, large discrepancies between IQ and reading scores indicate the child has a learning disability like dyslexia.

67.    In the report's "Classroom Teacher Input" section, P.T.'s fourth-grade teacher stated that "[s]pelling/phonics/reading fluency" is an area of concern. P-10 at 12.

68.    The report noted that a literacy specialist was meeting with P.T. twice per week at school. P-10 at 13.

69.    The literacy specialist reported that P.T., a fourth grader, was reading independently

---

[1] References to exhibits and the transcript are from the administrative trial.

at a kindergarten level. P-10 at 13.

70.    The report also stated that P.T. displayed clinically significant anxiety and withdrawal at school. P-10 at 34–35.

71.    Despite those findings, the District did not identify P.T. as a child with a specific learning disability or perform additional testing to identify the source of her reading deficits.

72.    The District found P.T. ineligible for an IEP.

73.    The January 2023 evaluation report concluded that though P.T. has a disability (ADHD), she is ineligible for an IEP because her "educational performance [wa]s not currently adversely affected." P-10 at 42.

74.    But the report recommended 12 accommodations to include in P.T.'s Section 504 service plan, including "[s]mall group instruction, especially in reading and math." P-10 at 43.

75.    At the start of fifth grade (the 2023-2024 school year), Parents emailed the District to report more concerns about P.T.: "[P.T.] continues to really struggle with Spelling, Math, reading . . . . She has had tears after school, saying things like 'she feels like a loser.'" P-53 at 36.

76.    Parents emailed the District routinely in fifth grade reporting P.T.'s struggles with schoolwork. *See, e.g.*, P-53 at 70 ("[P.T.] was []very emotional after school today saying she has to do this Zern math thing on the computer and she is moving at a very slow place and felt very frustrated. Are we able to work on some of that at home as well?"); P-53 at 72 ("[P.T.] did the best she could [on her homework] and we sat at the dining room table for an hour and a half (took some brain breaks) but she did not finish every question.").

77.    Parents also hired a second private tutor during fifth grade. The tutor provided P.T. intensive multisensory, sequential reading instruction because P.T. was still struggling in reading, writing, and math.

8

78. Intensive multisensory, sequential reading instruction is specialized instruction that is typically provided through an IEP.

79. The private tutor met with P.T. weekly and used the Orton-Gillingham program. At the end of fifth grade, Parents switched to a tutor that used the Wilson Reading Program.

80. Orton-Gillingham and the Wilson Reading Program are both multisensory, highly structured, systematic, and sequential phonics-based reading programs designed to help children with reading deficits, which usually indicate the child requires specialized instruction and thus qualifies for an IEP.

81. The District has "[s]pecial education teacher[s]" who are "Wilson trained," and the teachers provide Wilson instruction as specially designed instruction to students with disabilities. *See* Actions, Council Rock School District (Mar. 18, 2026), https://perma.cc/E38D-6T9S; Due Process Hearing Tr. 333 (District staff testifying that Wilson is a special-education service at the District).

82. Despite Parents paying for intensive private reading instruction during fifth grade, P.T. scored in the "well below" range on the District's benchmark assessments for literacy because P.T. needed even more intensive services than weekly private tutoring.

83. Throughout fifth grade, P.T. was unable to complete her homework on her own.

84. Parents helped P.T. with her homework, and even with their help, it took P.T. a long time to complete it.

85. P.T. frequently became frustrated and cried when she tried to do her homework.

86. P.T. felt "stupid" and was embarrassed that she could not complete her homework and perform on pace with her peers.

87. P.T. also frequently forgot at school materials and books that she needed to bring

9

home for homework.

88.    Parents informed the District about P.T.'s struggles with homework in fifth grade.

89.    During fifth grade, P.T. also struggled to complete her classwork on her own.

90.    There were a variety of accommodations that the District could have provided P.T. to ensure she had equal opportunity as neurotypical peers to perform her homework and classwork (e.g., after-school support).

91.    But the District ignored Parents' reports about P.T.'s struggles.

92.    Because P.T. had to spend so much time on schoolwork, she was unable to participate in extracurricular activities.

93.    P.T. could not continue to play a musical instrument in third grade, because she had to spend so much time trying to learn to read, write, and do math.

94.    P.T. wanted to participate in her school's broadcasting club in fifth grade, but she could not do so because she had to spend so much time trying to learn to read, write, and do math.

95.    P.T. quit playing softball in fourth grade because she had to spend so much time trying to learn to read, write, and do math.

96.    P.T. quit playing basketball in fifth grade because she had to spend so much time trying to learn to read, write, and do math.

97.    In March 2024, the spring of fifth grade, P.T. was still scoring in the "well below" range on her literacy benchmark assessments, and she was scoring in the "below" range on math.

98.    So Parents requested another evaluation under the IDEA.

99.    The District denied the request and instead offered P.T. another year of her Section 504 service plan.

100.    The District knew or should have known that the Section 504 service plan was

ineffective but it did not take corrective action.

101.    Because the plan was ineffective—even with Parents supplementing P.T.'s education with intensive reading tutoring and tutoring from a special-education teacher—Parents paid for an independent educational evaluation.

102.    The evaluation concluded that P.T. has specific learning disabilities in basic reading, reading fluency, and written expression and thus qualifies for an IEP.

103.    The evaluation explained that P.T. has double-deficit dyslexia, which means that she has phonological dyslexia (difficulty associating sounds with letters or groups of letters) and orthographic dyslexia (difficulty recognizing familiar words).

104.    The evaluation determined that P.T. needs, among other things, daily instruction using a program like Orton-Gillingham or Wilson; small class sizes; direct instruction in writing; and direct instruction and support for executive functioning, including instruction and support in planning, time management, and organization.

105.    The District never provided P.T. those supports.

106.    After the independent educational evaluation was completed, Parents provided it to the District.

107.    Rather than accept the findings, the District in November 2024 (during sixth grade) proposed to evaluate P.T. for IEP-eligibility—even though the District had denied Parents' request for an evaluation just a few months before.

108.    Parents consented to the evaluation on November 13, 2024.

109.    They also started exploring private-school options for P.T. because they were alarmed about her lack of educational progress and declining mental health, and they were alarmed by the District's ongoing indifference to P.T.'s struggles.

11

110.    In sixth grade, P.T. increasingly asked Parents why she was so "dumb"; she asked why she could not understand her schoolwork after studying so much; she no longer wanted to go to school in the mornings; and she felt that she was burdening her teachers.

111.    By late November 2024, P.T. was still struggling, and the District had not even begun her evaluation.

112.    On November 25, 2024, Parents informed the District that they intended to place P.T. in a private school at public expense because the District was still ignoring her needs. P-56 at 1.

113.    The private school they identified for P.T. was the Cambridge School, which specializes in teaching children with dyslexia and executive-functioning deficits.

114.    Over the next couple weeks, the District offered P.T. no additional services, nor did it complete its evaluation.

115.    On December 15, 2024, Parents enrolled P.T. at the Cambridge School.

116.    In January 2025, the District completed its evaluation of P.T.

117.    During the evaluation, P.T. showed signs of distraction and fatigue, which can depress scores.

118.    The school psychologist who performed the evaluation concluded that the testing "may need to be interpreted with caution." P-15 at 6.

119.    Even so, the District relied on the evaluation and again concluded that P.T. is ineligible for an IEP.

120.    Parents therefore kept P.T. enrolled at the Cambridge School.

121.    The Cambridge School provides P.T., among other things, small class sizes, daily instruction using the Wilson reading program, and direct support for executive functioning.

122.    At the Cambridge School, P.T. has made significant educational progress.

123.    P.T. does her homework independently, finishing it in about 20 to 25 minutes.

124.    P.T. reads chapter books by herself.

125.    P.T. won a writing prize at the Cambridge School.

126.    P.T. participates in extracurricular activities, including volleyball and stage crew.

127.    P.T. is "happy and excited to go to school every day." P-50.

128.    After Parents enrolled P.T. in the Cambridge School, they filed a due process complaint against the District on January 13, 2025, and they amended their complaint on June 9, 2025.

129.    In the amended complaint, Parents alleged that the District denied P.T. FAPE and violated her rights under the IDEA, Section 504, and the ADA.

130.    Parents requested tuition reimbursement for the Cambridge School for the 2024-2025 school year, compensatory education, reimbursement for P.T.'s private tutoring, and reimbursement for P.T.'s independent educational evaluation.

131.    After a hearing, a special-education hearing officer awarded Parents reimbursement for P.T.'s private tutoring but denied their other requests for relief. H.O. Dec. at 36–37.

**COUNT I**
**TUITION REIMBURSEMENT UNDER THE IDEA, SECTION 504, AND THE ADA**

132.    Parents incorporate paragraphs 1 through 131 as if fully set forth.

133.    The hearing officer erred by failing to award tuition reimbursement for the 2024-2025 school year.

134.    The District denied P.T. FAPE during the 2024-2025 school year.

135.    The District failed to provide P.T. an IEP even though she qualified for one.

13

136. Even if P.T. did not qualify for an IEP, the Section 504 service plan that the District provided P.T. did not meet her needs as adequately as the needs of her nonhandicapped peers.

137. The Section 504 service plan that the District provided P.T. did not afford her equal opportunity to benefit from the District's program.

138. The Cambridge School is an appropriate educational placement for P.T.

139. The equities favor tuition reimbursement. The IDEA permits reducing or denying tuition reimbursement if parents (1) failed to provide timely notice or (2) acted unreasonably. Neither factor applies.

140. Parents provided the District a 10-day notice of their intent to enroll P.T. in a private school under 20 U.S.C. §1412(a)(10)(C)(iii)(bb) and waited more than 10 business days before enrolling P.T. at the Cambridge School.

141. Parents fully cooperated with the District throughout the Section 504 and IDEA-evaluation processes.

## COUNT II
## COMPENSATORY EDUCATION UNDER THE IDEA, SECTION 504, AND THE ADA

142. Parents incorporate paragraphs 1 through 141 as if fully set forth.

143. The hearing officer erred by failing to award P.T. compensatory education.

144. The District denied P.T. FAPE during the 2023-2024 and 2024-2025 school years.

145. The District knew or should have known it was denying P.T. FAPE during the 2023-2024 and 2024-2025 school years.

146. The District failed to provide P.T. an IEP even though she qualified for one.

147. The Section 504 service plans that the District provided P.T. did not meet her needs as adequately as the needs of her nonhandicapped peers.

14

148. The Section 504 service plans that the District provided P.T. did not afford her equal opportunity to benefit from the District's program.

149. The District's discrimination harmed P.T.'s education and her mental health, causing her to suffer emotional harm.

150. Parents request compensatory education for each school day between January 13, 2023 and December 13, 2024.

## COUNT III
## INDEPENDENT EDUCATIONAL EVALUATION UNDER THE IDEA, SECTION 504, AND THE ADA

151. Parents incorporate paragraphs 1 through 150 as if fully set forth.

152. The District's 2023 evaluation of P.T. was deficient and failed to adequately assess P.T. in all areas of need.

153. The District's 2025 evaluation of P.T. was deficient and failed to adequately assess P.T. in all areas of need.

154. Parents are entitled to funding/reimbursement for an independent educational evaluation because the District failed to properly evaluate P.T.

## COUNT IV
## ATTORNEY'S FEES AND COSTS UNDER THE IDEA, SECTION 504, AND THE ADA

155. Parents incorporate paragraphs 1 through 154 as if fully set forth.

156. Parents prevailed at the due process hearing.

157. Parents obtained important and significant relief.

158. The special-education hearing officer ordered the District to reimburse Parents for years of private tutoring.

159.    As the prevailing party, Parents are entitled to reasonable attorney's fees and costs under 20 U.S.C. § 1415(i)(3)(B), 29 U.S.C. § 794a, and 42 U.S.C. § 12205 for the due process hearing and this action.

**WHEREFORE**, Parents respectfully requests that this Court:

1.    Order tuition reimbursement for the 2024-2025 school year.

2.    Order compensatory education for every school day between January 13, 2023 and December 13, 2024.

3.    Award Parents an independent educational evaluation.

4.    Award Parents their reasonable attorney's fees and costs.

5.    Correct any erroneous factual findings made by the Hearing Officer.

6.    Grant any other relief that this Court deems appropriate.

Respectfully submitted,

_____

DAVID J. BERNEY, ESQUIRE
JENNIFER Y. SANG, ESQUIRE
KEVIN A. GOLEMBIEWSKI, ESQUIRE
Berney & Sang
8 Penn Center
1628 JFK Boulevard, Ste. 1000
Philadelphia, PA 19103
djberney@berneylaw.com
215-564-1030 (office)
215-751-9739 (fax)
Attorneys for Parents

Dated: April 8, 2026